*H. A. WINTERS v. JOHN FANGBONER ET AL.

1. COST OF OUTLET DITCH ASSESSED AGAINST ALL LANDS BENEFITED.

Assessments for an outlet ditch may be extended so as to include all lands the drainage whereof through such outlet is facilitated by artificial means.

---

*Referred to in *Mason* v. *Fulton Co.* (*Comrs.*) 30 O. C. C. 49, 59.

Winters v. Fangboner.

2. Assessments for Outlet Ditch Draining Flat Lands Will not be Enjoined.

The construction of an outlet ditch, making it possible to tile and drain certain tracts of flat lands above it containing large, marshy spots and ponds impossible to drain by previous natural or artificial facilities without damaging lower tracts by casting overflow waters thereupon, and which effects a reclamation of the same for productive cultivatable land, shows sufficient actual benefits to justify an assessment therefor, against which a court of equity will refuse any aid under R. S. 4491 (Gen. Code 6500).

[Proof of this decision and syllabus was submitted to Judge Parker and corrected.—Ed.]

Appeal from common pleas court.

*Richards & Heffner,* for plaintiff.
*Meek & Dudrow,* for defendants.

## PARKER, J.

This action is brought by Mr. Winters to enjoin the collection of certain ditch assessments. The petition sets forth that in 1891, Mr. Wahl petitioned the commissioners of Sandusky county, Ohio, and the commissioners of Erie county, Ohio, for the straightening of a certain ditch, called the "Wahl ditch," along a certain route described in the petition; that the commissioners of said counties in joint session found that the ditch would be necessary, and that its construction would be conducive to the public health and welfare, and thereupon ordered that said improvement should be made, and the improvement was thereafter made, and the plaintiff's lands were assessed therefor, as follows:

A certain tract of 120 acres, which is described as tract 1, was assessed $210.

A certain tract of forty acres, described as tract 2, was assessed at $70.

A certain tract of sixteen acres, described as tract 3, was assessed at $26.

A certain tract of forty acres, described as tract 4, was assessed at $70, and

A certain tract of 140 acres, described as tract 5, was assessed at $89.70.

So that it appears that he had 333 acres assessed, and that

the total amount of the assessment upon these different tracts was $369.70, or a little over a dollar per acre.

The plaintiff complains that this assessment was not made according to the actual benefit. He sets forth what he supposes to have been the theory upon which the commissioners proceeded in making the assessment, viz., that they proceeded upon the theory that they had a right to levy an assessment upon all the lands that cast waters into this ditch—which is an outlet ditch—all of the lands comprised within the bounding watersheds, and he says that gross injustice was done in the apportionment of the cost of this improvement, and he asks that the consummation of this injustice may be prevented by injunction.

The averment as to these assessments not having been made according to the actual benefits to the lands is denied by the defendants in their answer, and it is averred therein that Mr. Winters was one of the petitioners for the ditch, and certain other facts are averred therein in respect to plaintiff's conduct in the matter, which the defendants contend give rise to an estoppel.

It appears that Mr. Winters was one of the petitioners for this ditch improvement. That his lands, consisting of these five several tracts, lying contiguous to one another, are in fact one body of land. The tracts extend quite a long distance from north to south, but are not so wide from east to west. This outlet ditch begins near the north part of his lands, and extends thence through these and other lands into Erie county, and to the outlet in Sandusky bay.

It seems to have been quite a large and important improvement. It is described by the witnesses as a "dredged ditch," because a dredge was used in its construction. It was constructed through marsh land, and it was necessary on account of the condition of the lands, to dig it with a dredge.

Part of these lands of Mr. Winters are marsh lands, wet and boggy, and at certain seasons of the year they overflow, especially the north parts. The whole territory thereabout is quite flat. From the southern to the northern extremity of his

Winters v. Fangboner.

land there is a fall upon the surface of about fourteen feet, and along the east side of all of his lands (excepting tract 4, which is about forty acres), there has been for years a township ditch which affords him some drainage facilities, but all the water was not carried away from the lower part of this land until after the construction of the improvement mentioned in the petition. Theretofore the water backed up quite a distance, and during wet seasons of the year it overflowed his lands and the lands of others in that locality.

I have said that Mr. Winters was one of the petitioners for this ditch, and he appears to have been present at the joint hearing before the commissioners of these two counties when they had this improvement under consideration, and he was one of the promoters, and the testimony is undisputed that, on the day the apportionment was made of the costs and expense that would arise from the construction of this improvement, he was present and made no objection to the amount it was then stated in his presence would be assessed upon his lands for this improvement, to wit, the amount afterward assessed thereon, of which he now complains.

We are not advised whether the burdens of this improvement have been fairly and equitably apportioned upon all of the lands of the different proprietors that have been assessed. We have no evidence upon that subject.

The contention of the plaintiff is not upon the ground that there has been an unfair distribution of the burdens between himself and the other proprietors, but he says that his lands have been assessed beyond the amount of the benefits accruing to them; and he invokes the aid of the court under R. S. 4491 (Gen. Code 6500), which authorizes a court of equity, even where the proceedings are legal and regular, to correct and remedy gross injustice, if it shall appear.

These assessments were distributed in six semiannual payments. Two of the semiannual payments were made by Mr. Winters without objection. The third and fourth were made by him under protest; that is to say, when he went to the treasurer's office, and offered to pay all of his taxes excepting the installments then due on account of these assessments and the

treasurer declined to receive any of his taxes and assessments unless he would also pay these. That occurred upon two occasions; and upon this statement being made by the treasurer, without more ado other than signifying his objection, and saying he did it under protest, plaintiff proceeded to pay these as well as the other taxes and assessments. He asks now that in adjusting his rights, the court shall take into consideration what he has paid upon the various tracts and allow anything paid on any tract in excess of the amount justly payable thereon, as a credit upon the unpaid assessments upon other tracts.

The view we take of the case will not require us to consider whether or not this may in any case be done. The contention of the plaintiff is based upon the theory, as it seems to us, that no lands can be assessed for such an improvement except such as at the time of the making of the improvement, or subsequently thereto, receive a direct benefit by way of drainage then or thereafter made or provided for.

We have considerable testimony here upon the part of the plaintiff as to the distance toward the south up this township ditch, that water may be backed or banked by building a dam across it at the lower end. Experiments have been made, and it does not appear that the water can be backed up beyond the middle of tract 2, and the southern part of tract 4, which lies immediately east of tract 2.

Now tracts 1 and 5, which are the largest tracts, one being the 120-acre tract, and five being the 117-acre tract, and which are the tracts that plaintiff says are not benefited at all by this improvement, cannot be affected by such backing up of the waters in this township ditch. It appears to be demonstrated that, even before the construction of this outlet ditch, tracts 1 and 5 might have been so thoroughly drained into this township ditch as that all the water would have been carried therefrom to some point below. That has since been done; and it appears that the carrying of the water off of tracts 1 and 5, has not been facilitated by the construction of this outlet.

From this state of facts, it is contended that tracts 1 and 5 are not so benefited that any part of the assessment may be lawfully levied thereon.

It is contended by counsel for plaintiff that a decision of this court, *Buckley* v. *Lorain Co. (Comrs.)* 1 Circ. Dec. 137 (1 R. 251), sustains their contention and view of the matter. They also cite as authority in support of their position the case of *Blue* v. *Wentz,* 54 Ohio St. 247 [43 N. E. Rep. 493].

In those cases it is distinctly held that it is not proper for the commissioners to levy ditch assessments upon lands simply because water from such lands may or does find its way into the ditch improvement. But the fact was in each of those cases, that the water found its way into the ditch, not by reason of the improved drainage thereby afforded, nor by reason of the flow of the water being facilitated by the industry of man, but by reason of the fact that the natural drainage carried the water down to the outlet. It does not appear to us in the case at bar that the natural drainage from tracts 1 and 5 would have carried the water therefrom to the outlet afforded by this improvement, or further than the lands lying immediately north of said tracts.

The holding in the case of *Blue* v. *Wentz, supra,* is that,

"Where the lands of an owner, by reason of their situation, are provided with sufficient natural drainage, they are not liable for the costs and expense of a ditch necessary for the drainage of other lands, simply for the reason that the surface water of his lands naturally drain therefrom to and upon the lands requiring artificial drainage.

"A lower tenement is under a natural servitude to a higher one to receive from it all the surface water, accumulating from falling rains and melting snows, or from natural springs, that naturally flow from it to and upon the lower one. This advantage of the higher tenement is a part of the property of the owner in it, and he is not indebted to the lower tenement therefor.

"In making an assessment on lands, benefited by artificial drainage, the extent of their watershed is not the proper rule, but the amount of surface water for which artificial drainage is required to make them cultivatable, and the benefits that will accrue to the lands from such drainage. However much water may fall on them or arise from natural springs, if, by reason

of their situation, they have adequate natural drainage therefor, they are not liable for the cost of artificial drainage to other lands."

In the discussion of the case in the opinion of the court, it is distinctly indicated and emphasized that the rules laid down limiting the authority of the commissioners to extend the assessments beyond the immediate neighborhood of the improvement itself are based upon the right of a proprietor to have and enjoy, without charge or expense, his advantages of natural drainage. There is no question, I think, but that assessments for an outlet ditch may be extended so as to include all lands the drainage whereof is facilitated by artificial means where the improvement on account of which they are assessed furnishes an outlet for the waters thus brought down from such lands.

If this township ditch and this county ditch, for instance, had both been constructed at one time, as one single continuous improvement, we think it is apparent that by applying correct rules and principles applicable to the levying of assessments, the cost could have been assessed upon all these various tracts of land, and that the cost need not to have been limited to the amount that plaintiff might be required to pay for so much of the drainage as would be afforded by the township ditch, but, because of his having given this outlet, his assessment might include a just proportion of the cost of continuing the ditch to the ultimate outlet in Sandusky bay; and in that case the assessment might have been as much as he has been assessed on the two improvements without exceeding his benefits or his just proportion of the burdens.

These different tracts described as tracts 1, 2, 3, 4 and 5, though lying in one body, seem to have been treated by the commissioners as separate and distinct tracts, and perhaps we should treat them so—perhaps we are required to do so; and we will consider the rights of the plaintiff viewing them in that light; and to make our views clearer we will treat tracts 3 and 4, the lower or northern tracts, as if they belonged to another proprietor,—as if they were not owned by the plaintiff at all. In that case, would the commissioners have a right to assess

any part of the cost of this outlet ditch upon tracts 1 and 5 belonging to this plaintiff?

According to the testimony of the witnesses as I have said, tracts 1 and 5, as well as the other lands, are flat lands, although they lie from twelve to fourteen feet above the part of the northern portion of plaintiff's land where this outlet ditch begins. They require considerable artificial drainage. They had been tiled and ditched to some extent before this other ditch was dug, but they have been tiled and drained more effectively since.

It appears that part of tract 5 was marshy and in a bad condition and not cultivatable before this ditch was dug. One of the witnesses testified that in the spring of the year it was impossible to go upon part of it with horses, because they would become mired. And upon tract 1 was a large swale of an acre and a half or two acres, in which water stood throughout the year, and where persons skated and cut ice in the winter and fished in the summer, and in which, according to the testimony of one witness, who was very specific upon the subject, there were certain "fish known as pike that would swim in the water."

After this outlet ditch was dug, and not before, the boggy land of tract 5 was drained so as to be subject to cultivation, and the swale in tract 1 was drained so that it was made dry and subject to cultivation, and the remainder of these tracts were in some measure improved, to exactly what extent, measured in dollars and cents, we will not pretend to say; but we cannot say that they were not improved after the digging of this outlet to an extent that would justify the assessment upon tract 5, of $89.75, and upon tract 1 of $210.

We think that enough land was reclaimed in tract 1, to nearly justify the assessment thereon. As I have pointed out, the assessment upon the whole territory amounted to only about one dollar per acre, which does not seem to us, who have been accustomed to ditch assessments in northwestern Ohio, to be a very heavy assessment.

Now, while it may be true that it was possible and practicable to have drained tracts 1 and 5, as effectually before the

construction of this outlet as after, yet we must consider the consequences to other property to have done that before the outlet was constructed—the consequences to the proprietors below, if we treat these lower tracts as lands of other proprietors. It must be considered whether plaintiff had a right to thus drain tracts 1 and 5; whether before he obtained this outlet he was in a situation where he might do it lawfully and without being subject to a claim for damages. We think he had not that right, and that the benefits that accrued to him from the construction of this outlet, were these: that, being the owner of the lower tracts, he was enabled to cast the waters down upon the same from tracts 1 and 5 without doing damage to the lower tracts, and with respect to the lower lands of other proprietors he was relieved of liability for damages. He drained this large pond through the lands below without injury thereto, but, according to the testimony, if this had been done before this outlet was constructed the water carried down to the lands below would have backed up in the township ditch and would have overflowed the lands below near where the outlet ditch begins, so as to damage the lands of plaintiff and those of his neighbors lying in that locality.

As throwing some light upon the legal phase of this situation, I refer to the case of *Butler* v. *Peck*, 16 Ohio St. 335 [88 Am. Dec. 452]. The syllabus reads:

"Where upon the lands of B there is marshy basin, from which, in times of high water, a portion of the water contained in the basin overflows its rim and naturally finds its way through a swale to and upon the lands of P, while the remaining portion of the water in the basin has no outlet, and is dissipated by evaporation; B cannot rightfully, by an artificial drain, conduct the water that has no natural outlet from the basin, and along said swale so as to cause them to flow upon the lands of P to his damage."

Now that case, as stated in the syllabus, and as more fully and distinctly stated in the report, described the situation of the plaintiff here, with respect to the injury and damage that would be done to his lower tracts and those of his neighbors by drainage of marshes and swamps and swales, if it were

Winters v. Fangboner.

done before the opening of the outlet that this new improvement gives to them.   .

Upon this subject of the servitude for drainage, of lower lands to lands lying above, I read from this same report, at page 342:

"The principle seems to be established and indisputable, that where two parcels of land, belonging to different owners, lie adjacent to each other, and one parcel lies lower than the other, the lower one owes a *servitude* to the upper, to receive the water which *naturally* runs from it, provided the industry of man has not been used to *create the servitude*.   Or, in other words more familiar to the students of the common law, the owner of the upper parcel of land has a *natural easement* in the lower parcel, to the extent of the natural flow of water from the upper parcel to and upon the lower."

Besides his own lower tracts there were lands of other proprietors in that locality which were overflowed somewhat by water from this township ditch, and an increase of the overflow upon which would have been caused by the complete drainage of the waters from tracts 1 and 5.   By making this improvement, the plaintiff is given the means of casting down the water from tracts 1 and 5, without increasing the damages to his lots below, and without incurring liability for damages to other lots below, and therein and thereby we think he has received a very substantial benefit to tracts 1 and 5 as well as to his other lands, and we are not prepared to say that those benefits are not as great as the amount assessed.   Therefore the petition will be dismissed and the costs adjudged against him.

**Haynes** and **Hull, JJ.,** concur,